IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


REGINA McCORD,

      Plaintiff,

v.                                      Case No. 2:13-CV-2362-JTM

BNSF RAILWAY COMPANY,

      Defendant.


## MEMORANDUM AND ORDER

Plaintiff Regina McCord ("plaintiff") seeks monetary damages from her past employer, defendant BNSF Railway Company ("defendant") for alleged discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"). This matter is before the court on defendant's Motion for Summary Judgment (Dkt. 37). For the reasons stated below, defendant's motion is granted.

### I.      Factual and Procedural Background

Plaintiff began her working relationship with defendant on November 18, 2010, as a contract employee assigned as a training coordinator for defendant's National Academy of Railroad Sciences ("NARS"). NARS provides training to students and individuals in the railroad industry and is located in defendant's Technical Training Center ("TTC") on the campus of Johnson County Community College ("JCCC"). Plaintiff became a regular at-will employee on July 18, 2011. She performed administrative duties, including answering the phone and taking

1

messages, filing, setting up training sessions for individuals in the railroad industry, and handling registrations.

Housed in plaintiff's office in the TTC were also her supervisor, senior manager John Irons ("Irons"), another training coordinator, Nicole Plute ("Plute"), and a female JCCC employee, Terry Murphy-Latta ("Murphy-Latta").[1]  Plaintiff's claims of sexual harassment and gender discrimination involve several incidents with an adjunct JCCC professor, Steve Priest ("Priest").  Plaintiff alleges that, in March 2012, Priest entered the TTC office and requested some class materials.  Plaintiff allegedly told Priest that she did not have the authority to give him the materials at which point, according to plaintiff, Priest became "extremely confrontational," "raised his voice and was yelling," and moved towards plaintiff, causing her to back up.  Dkt. 37-1, at 22.  Plaintiff alleges that Murphy-Latta witnessed the incident and, while slamming her fist into her hand, told plaintiff that she needed to give Priest the materials so he could do his job.  Plaintiff reported this incident (along with others not relevant to this litigation) to one of defendant's human resources representatives, Tamala Cleaver ("Cleaver"), who in turn drafted a memo to a JCCC human resources representative.  In May 2012, the JCCC human resources representative responded, stating that "while several of the incidents did occur, the context in which the allegations were outlined were somewhat misleading and taken out of context."  Dkt. 37-1, at 25.  The representative went on to say, however, that "many of the concerns raised, regardless of the context, were inappropriate for the workplace and the JCCC employees involved [had] been coached with respect to workplace professionalism."  Dkt. 37-1, at 25.

---

[1] While plaintiff made multiple allegations against Murphy-Latta during the course of her employment with defendant, she makes clear in her Amended Complaint and Opposition that this conduct is not at issue.  The court therefore forgoes discussion of these allegations.

In another incident, plaintiff alleges that, while she and Plute were walking back from lunch one day, Priest crossed a sidewalk and stood directly in front of plaintiff and asked a question.  Plaintiff claims that she answered the question and that the pair then stepped around Priest and went back to their office.  In a third incident, plaintiff alleges that she observed Priest standing in a hallway outside of her work area, prompting plaintiff to leave her office.

At some point, defendant relocated plaintiff, Plute, and Irons into an office across the hall, approximately ten to twelve steps from the previous location.  According to Irons, one of the reasons for the move was to separate defendant's employees from the JCCC employees in an effort to eliminate workplace conflict.  The move was also accompanied by a change in plaintiff's duties.  She no longer conducted classroom scheduling or answered telephone questions about NARS.  However, her compensation, benefits, and working hours did not change and she continued to report to Irons.

In August 2012, the General Director of the TTC, Scott Schafer ("Schafer"), announced a series of organizational changes within the TTC.  These changes affected the reporting relationships of a large number of employees, including plaintiff, who was assigned as a training coordinator in the Learning Solutions Office ("LSO").  This reorganization also meant that plaintiff reported to a new supervisor.  Plaintiff's office location remained the same, as did her compensation, benefits, and job title.  Her previous position with the NARS program was not filled.

Plaintiff was to begin working for the LSO on October 15, 2012.  However, on the evening of October 14, 2012, plaintiff sent an e-mail to defendant requesting a sick day.  On October 15th defendant received an e-mail from plaintiff's attorney containing plaintiff's request for an eight-week leave of absence allegedly due to her recent diagnosis of stress, anxiety, and

depression.   Human resources representative Kelli Courreges ("Courreges") responded to plaintiff's counsel and offered plaintiff multiple options for requesting a leave of absence. Plaintiff thereafter began a leave of absence pursuant to defendant's short-term disability program, during which she received at least some portion of her salary and health insurance benefits.

On January 25, 2013, more than twelve weeks after plaintiff began her leave, she received a letter from defendant advising her that, pursuant to its short-term disability program, defendant was going to move forward with filling her LSO training coordinator role.  The letter further stated that, in the event plaintiff was released from short-term disability and her position had already been filled, she would have sixty days to place herself in another of defendant's open positions for which she was qualified.  If plaintiff was unable to obtain a position with defendant during that time frame, she was advised that her employment may be terminated.

On February 7, 2013, Courreges e-mailed plaintiff's counsel to discuss a statement that she had received from plaintiff's health care provider indicating that plaintiff could return to work if she were placed in a different department.  On February 14, 2013, plaintiff's counsel replied and stated that plaintiff was unable to return to work at the TTC but "that any available position that the company would wish to offer her [would] be given very careful consideration" as long as it provided a reasonable accommodation of plaintiff's limitations.  Dkt. 37-1, at 73. On February 25, 2013, Courreges notified plaintiff's counsel that the only position available in the greater Kansas City area for which plaintiff was qualified was her LSO training coordinator position, which had not yet been filled.  Counsel advised Courreges that plaintiff would give the offer careful consideration as long as defendant complied with the accommodations requested by plaintiff's treating therapist, Bryan Vignery ("Vignery").   These accommodations required

plaintiff: (1) be allowed time off to attend counseling sessions one hour per week; (2) be allowed to remove herself from situations that she found to be too stressful; (3) be allowed to contact campus security any time she felt discomfort or was, in her opinion, threatened either verbally or emotionally; and (4) not be required to interact with Schafer, Priest, or Murphy-Latta.

In a response dated March 6, 2013, Courreges explained that: (1) Schafer was the director of the TTC and therefore interaction with him would be a required part of plaintiff's job; (2) while plaintiff would not be *required* to interact with Priest or Murphy-Latta, she could not guarantee that plaintiff would never run into either individual; and (3) defendant could not "reasonably be expected to provide [plaintiff] a workplace that is free of stress," and that it "can't reasonably be expected to permit [plaintiff] to unilaterally determine when and for how long she [would] be at or away from work" in the event that she found a particular situation to be too stressful. Dkt. 37-1, at 79.

In reply, plaintiff's counsel stated that plaintiff's key accommodations could be accomplished by allowing plaintiff to work exclusively from home. Courreges responded by sending plaintiff's counsel an overview of the LSO training coordinator position, which stated that the job "requires a minimum of an eight-hour working day *on site*, and requires daily interactions with various instructors and employees of JCCC, including the NARS staff." Dkt. 37-1, at 84. The overview further detailed that the position "interacts with the various BNSF employees inside and outside of the TTC, both *in person* and sometimes over the phone, when assisting field personnel." Dkt. 37-1, at 84 (emphasis added). Courreges also stated that plaintiff would be required to undergo seven weeks of on-site training before defendant would explore the possibility of an exclusive remote-work option.

On April 18, 2013, counsel wrote to Courreges asking whether defendant would even consider a remote working relationship for plaintiff and, if so, what conditions would be placed on plaintiff.  Courreges responded four days later, stating that given the fact that plaintiff had "not yet even trained on the position," defendant was "unable to say . . . what conditions might be placed on remote work."  Dkt. 37-1, at 86.  Courreges noted, however, that defendant was "open to discussing whether and what circumstances working remotely may [be] feasible after [plaintiff had] completed the initial training period."  Dkt. 37-1, at 86.  Counsel responded on April 29, 2013, stating that plaintiff either wanted defendant to provide her with the accommodations issued by Vignery or allow her to work exclusively from home.  On May 6, 2013, Courreges e-mailed plaintiff's counsel to confirm that, based on the April 29th email, plaintiff was in fact declining to come on-site for even the seven-week training course. Courreges further stated that given the fact that plaintiff had "never actually worked in" the new position, Courreges did "not believe her request to work from home [was] reasonable, even assuming [plaintiff was] entitled to a reasonable accommodation."  Dkt. 37-1, at 89.  Courreges also noted that, since the sixty-day period had expired, defendant considered plaintiff's refusal to participate in the training program her official resignation from employment.  Plaintiff denied ever resigning her employment.

On May 14, 2013, plaintiff filed suit against defendant in the District Court of Johnson County, Kansas, case number 13CV03557.  She filed an Amended Petition on June 27, 2013. On July 19, 2013, defendant removed plaintiff's action to the United States District Court, District of Kansas citing jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  Defendant now seeks summary judgment on all of plaintiff's claims.

## II.      Legal Standard for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.  *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  The nonmovant must then bring forth specific facts showing a genuine issue for trial.  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits – conclusory allegations alone cannot survive a motion for summary judgment.  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.      Analysis

### Gender Discrimination/Harassment

Plaintiff alleges that she was subjected to gender discrimination in the form of sexual harassment and/or a hostile working environment due solely to the actions of Priest, namely: (1) the "request for materials incident" in March 2012, (2) the "sidewalk incident," and (3) the "hallway incident."[2]

---

[2] In her Opposition to defendant's Motion for Summary Judgment, plaintiff alludes to this behavior as "tantamount to stalking." Dkt. 43, at 12.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a Title VII violation by proving that discrimination based on sex created a "hostile or abusive work environment."  *Meritor Savings Banks, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  To establish a prima facie case of hostile work environment under Title VII, a plaintiff must show that: "(1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer."  *Meis v. Myron's Dental Labs, Inc.*, 2005 U.S. Dist. LEXIS 15318, at *21-22 (D. Kan. July 14, 2005) (citing *Brandau v. State of Kansas*, 968 F. Supp. 1416 (D. Kan. 1997)).

For purposes of summary judgment, defendant appears to concede that plaintiff was a member of a protected class and that the conduct in question was unwelcome.  Therefore, the only elements at issue are whether: (1) Priest's alleged harassment was based on plaintiff's sex, (2) the alleged harassment was sufficiently severe or pervasive to create an abusive working environment, and (3) assuming these elements are met, there is sufficient evidence to impute liability to defendant.  Defendant argues that plaintiff fails to establish her prima facie case.  The court agrees.

With regard to the "request for materials" incident in March 2012, plaintiff alleges that Priest entered the NARS office and requested some class materials.  When plaintiff refused to give Priest these materials, allegedly because she did not have the authority to do so, plaintiff alleges that Priest became "extremely confrontational . . . [and] raised his voice and was yelling."

Dkt. 37-1, at 22.  She further claims that Priest kept approaching her until she had backed up such that there was nowhere else to go.  Dkt. 37-1, at 22.  In the "sidewalk" incident, plaintiff alleges that she was walking back from lunch with Plute when she saw Priest approaching from the opposite direction.  Dkt. 37-1, at 23.  She claims that she suggested to Plute that they move to the other side of the sidewalk to avoid any interaction, but alleges that when Priest got closer, he too crossed the sidewalk and "came to stand directly in front of [her], which impeded [her] forward progress."  Dkt. 37-1, at 23.  Plaintiff alleges that Priest asked the two women a question, plaintiff answered, and then the two women stepped around Priest and went back to their office.  Dkt. 37-1, at 24.  Finally, during the "hallway" incident, plaintiff alleges that Priest stood in the short hallway where plaintiff walked to get to her cubicle.  Dkt. 37-1, at 26. Plaintiff testified at her deposition that she "pretty much froze because of everything that had happened previously.  [She] just downed [her] head, went back into [her] cube."  Dkt. 37-1, at 26.

Based on this evidence, plaintiff fails to establish that the alleged harassment was based on sex.  While the "request for materials" incident suggests the possibility of some office tension, although brief, plaintiff fails to provide any evidence that shows it occurred because of her gender.  Plute, who testified that she was present for the incident, stated that she did not recall Priest using any words or language that could have been interpreted as referring to plaintiff's gender.  Dkt. 37-2, at 13.  Furthermore, neither the encounter on the sidewalk nor the incident in the hallway suggests anything more than the passing of two coworkers.  Although plaintiff claims that Priest impeded her "forward progress" on the sidewalk, by plaintiff's own admission, all he did was "say something about the day."  Dkt. 37-1, at 24.  Again, Plute, who was present for the "sidewalk" incident, testified that she did not recall Priest using any gender-based language.  Dkt. 37-2, at 13.  Moreover, plaintiff does not allege that there was *any*

interaction between the two when she spotted Priest in the hallway outside of her cubicle.  It was established that Priest worked just across the hall and thus could very well have had a legitimate reason for being in that hallway completely unrelated to plaintiff.

The Tenth Circuit has held that "[i]f the nature of an employee's environment, however unpleasant, is *not due to her gender*, she has *not* been the victim of sex discrimination as a result of that environment."  *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (quoting *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994)) (emphasis in original). While plaintiff's interactions with Priest may be viewed as unpleasant, she fails to present any evidence that her gender was a factor.  As such, plaintiff fails to establish a prima facie case for sexual harassment and/or hostile working environment.

Even if she *could* establish that the alleged harassment was based on gender, plaintiff also fails to establish that these three incidents were sufficiently severe or pervasive to create an abusive working environment.   There is no "mathematically precise test" for determining whether conduct is sufficient severe or pervasive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  Rather,

> [t]he existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Meis*, 2005 U.S. Dist. LEXIS 15318, at 22-23 (quoting *Harris*, 510 U.S. at 23); *see also Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  The court evaluates these factors from both a subjective and objective viewpoint. *Meis*, 2005 U.S. Dist. LEXIS 15318, at *22; *see also Harris*, 510 U.S. at 21.  "The [c]ourt must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee

in plaintiff's position." *Meis*, 2005 U.S. Dist. LEXIS 15318, at *22-23; *see also Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998).

Here, the three alleged incidents occurred over an undetermined period of months.  All the evidence shows is that the request for materials incident occurred in March 2012 and the other two encounters occurred sometime after May 2012.  Plaintiff seems to allege that the request for materials incident was physically threatening, although she admitted in her deposition that she was not physically touched or injured.  Dkt. 37-1, at 22.  Plaintiff makes no claim that Priest's actions interfered with her work performance.  As such, plaintiff's alleged harassment was not sufficiently severe or pervasive such that it created an abusive working environment.  Without satisfying elements three and four, plaintiff cannot maintain a claim for sexual harassment and/or hostile working environment.

The court pauses here to note that, *even if* plaintiff could establish a prima facie case of harassment, she cannot impute liability to defendant.   "An employer may be directly or vicariously liable for a hostile workplace.  *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 650 (10th Cir. 2013) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998)).  "An employer is directly liable for a hostile work environment created by an employee if the employer's negligence causes the actionable work environment."  *Id.* (quoting *Baty v. Willamette Indus.*, 172 F.3d 1232, 1241 (10th Cir. 1999)).   "An employer is negligent . . . if it knew or should have known about the conduct and failed to stop it."  *Id.* (quoting *Ellerth*, 524 U.S. at 759).  The United States Supreme Court has held that,

> [t]o avoid vicarious liability, an employer can take advantage of an affirmative defense – the *Faragher* defense – by showing that the employer 'exercised reasonable care to avoid harassment and to eliminate it when it might occur,' and that the complaining employee 'failed to act with like reasonable care to take advantage of the employer's safeguards.'

*Id.* (quoting *Faragher*, 524 U.S. at 805).

Here, plaintiff alleges that she reported the request for materials incident to defendant's human resources representative Cleaver.   Cleaver, in turn, drafted a memo to a JCCC human resources representative detailing plaintiff's allegations.   The JCCC representative responded to Cleaver's memo, stating that "the JCCC employees involved have been coached with respect to workplace professionalism."   Dkt. 37-1, at 25. Plaintiff admitted that Cleaver shared this response with her.   Dkt. 37-1, at 25.   When plaintiff reported her concerns about the sidewalk and hallway incidents, defendant responded by moving plaintiff's entire office, including Irons and Plute across the hall away from Priest and other JCCC employees.   Plaintiff admitted that this move was a good thing.   Dkt. 37-1, at 28.   Based on this evidence, the court finds that no reasonable jury could find that plaintiff suffered gender discrimination in the form of sexual harassment.

Because plaintiff fails to satisfy the elements of her prima facie case, defendant is entitled to judgment as a matter of law.   The court therefore grants defendant's motion for summary judgment with regard to Count I of the Amended Complaint.

**Disability Discrimination**

Defendant also seeks summary judgment on plaintiff's claims of disability discrimination.   The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   Discrimination may be proven through either direct or indirect evidence.   *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (internal citations omitted).   Here, plaintiff fails to come forward with any direct evidence of

discrimination.  The Court must therefore determine if there is sufficient indirect evidence for plaintiff to survive summary judgment.

### A.      Prima Facie Case

Plaintiff's ADA discrimination claim focuses on defendant's alleged failure to accommodate, i.e., defendant's failure to provide a reasonable accommodation for her stress and anxiety.  The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).   "However, an employer is not required to always provide the employee with the best possible accommodations or in the specific manner the employee requested."  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001) (citing 29 C.F.R. § 1630.2(p)(1)).  An employer retains "broad discretion in determining which alternative accommodation should be provided."  *Id.* (citing 29 C.F.R. § 1630.9).

Plaintiff alleges that she made several requests for what she viewed as "reasonable accommodations," including: (1) time off to attend counseling sessions one hour per week, (2) the ability to remove herself from situations she found to be too stressful, (3) the ability to immediately contact campus security in the event that she felt discomfort or threatened in any way, (4) not being required to interact with Schafer, Priest, or Murphy-Latta, and (5) the ability to work exclusively from home.   Defendant argues that none of plaintiff's requests were reasonable.

To establish a prima facie case of failure to accommodate, a plaintiff must show that: "(1) [s]he has a disability within the meaning of the ADA; (2) the employer had notice of [her]

disability; (3) [s]he could perform the essential functions of the job with *reasonable* accommodation; and (4) the employer refused to provide such accommodation." *Harmon v. Sprint United Mgmt. Corp.*, 264 F. Supp. 2d 964, 971 (D. Kan. 2003) (quoting *Bones v. Honeywell Int'l, Inc.*, 223 F. Supp. 2d 1203, 1218 (D. Kan. 2002)) (emphasis added). Here, defendant accepts, solely for purposes of summary judgment, that plaintiff had a disability within the meaning of the ADA and that it had notice of that disability. Dkt. 38, at 22.[3] Therefore, only elements three and four are at issue.

### 1.    Essential functions of the job with reasonable accommodation

A plaintiff bears the burden of showing that she is able to perform the essential functions of her job. *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (internal citations omitted). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The court will consider a variety of evidence in determining whether a particular function is "essential," including:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job.

*Mason*, 357 F.3d at 1119 (citing 29 C.F.R. § 1630.2(n)(3)); *see also Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000).

Here, defendant described the essential functions of plaintiff's job as an LSO training coordinator as follows:

---

[3] Defendant reserves the right to challenge plaintiff's contention that she is legally disabled should any issues remain for trial.

The position requires a minimum of an 8-hour work day workday (varying from 0700 to 1700) *onsite* and requires daily interactions with various instructors and employees of Johnson County Community College, including the NARS staff.  In addition, the position interacts with various BNSF employees, inside and outside of the TTC, both in person and sometimes over the phone when assisting field personnel.  Daily interaction with BNSF's instructor staff is critical to the success of the position.

The direct reporting structure includes . . . Scott Schafer, General Director Railroad Training Services, who are all actively involved in all LSO processes and functionality.  It is to be expected that there often will be daily interactions with the entire management team for reporting purposes, processes and discussions in order to support TTC/BNSF operations.  These interactions may be face-to-face, individually or in group meetings and/or through email and telephone.  Direction may be given from any of these communication modes, as well as other managers and directors on the TTC staff.

Dkt. 37-1, at 84.

The ADA requires the court to consider "the employer's judgment as to what functions of the job are essential."  *Mason*, 357 F.3d at 1119 (citing 42 U.S.C. § 12111(8)).  "The employer describes the job and functions required to perform that job."  *Id*. (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999)).  The court "will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity."  *Id*. (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)).  "In short, the essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards."  *Id*. (internal quotations omitted).  The court therefore accepts defendant's proffered description of the essential functions of plaintiff's position.

The next step is to determine whether plaintiff's proposed accommodations were, in fact, reasonable.  The Tenth Circuit has held that to

defeat an employer's motion for summary judgment, the employee must first demonstrate that an accommodation appears reasonable on its face.  The burden of production then shifts to the employer to present evidence of its inability to

accommodate.  If the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. Whether an accommodation is reasonable under the ADA is a mixed question of law and fact.

*Mason*, 357 F.3d at 1122.  Of plaintiff's five proposed reasonable accommodations, defendant appears to take issue with only three: (1) that plaintiff be able to remove herself, at her discretion, from situations she found to be too stressful; (2) that plaintiff not be required to have any interaction with Schafer, Priest, or Murphy-Latta; and (3) that plaintiff be allowed to work exclusively from home.

With regard to plaintiff's request that she be able to remove herself from situations she found to be too stressful, defendant informed plaintiff, via an email from Courreges to plaintiff's counsel, dated March 6, 2013, that it was unreasonable for her to expect defendant to provide a "workplace that is free of stress."   Dkt. 37-1, at 79.   Defendant expressed concern about plaintiff's ability to meet performance expectations and perform her essential job functions while simultaneously being allowed to decide "when and for how long she will be at or away from work." Dkt. 37-1, at 79.  At the time, plaintiff offered no real explanation as to why her request was reasonable other than that "she possesse[d] one or more disabling conditions of which [defendant was] aware," and that defendant was "obliged to accommodate her . . . ." Dkt. 37-1, at 83.  Even now, plaintiff fails to provide any more specific details as to what would trigger her need for time away or how much time she would need.  The Tenth Circuit has previously held that "[w]hile specific stressors in a work environment may in some cases be legitimate targets of accommodation, it is unreasonable to require an employer to create a work environment free of stress and criticism."  *Gonzagowski v. Widnall*, 115 F.3d 744, 747-48 (10th Cir. 1997) (finding made within the context of the Rehabilitation Act, 29 U.S.C.S. § 701 *et seq.*, which was amended

to conform to the requirements of the ADA in 1992) (internal citations omitted).  As such, the court finds plaintiff's request to be unreasonable on its face.

With regard to plaintiff being assured of no interaction with Schafer, Priest, and Murphy-Latta, defendant informed plaintiff that, while it would not *require* her to interact with Priest or Murphy-Latta, defendant could not "guarantee that she [would] never see either individual on the JCCC campus."  Dkt. 37-1, at 79.  However, Schafer was the director of the TTC, the facility at which plaintiff worked, and was plaintiff's highest-ranking supervisor at the facility.  Therefore, defendant informed plaintiff that "interaction with Mr. Schafer [was] an essential job function" and it would "not agree that [plaintiff] need not interact with him as required."  Dkt. 37-1, at 79.  Plaintiff's only response to this was that defendant could accommodate this request by allowing her to work remotely from home.  Dkt. 37-1, at 81.

As noted above, the court will not second-guess defendant, as an employer, on its judgment about a reasonable accommodation when "its description is job-related, uniformly enforced, and consistent with business necessity."  *Mason*, 357 F.3d at 1119.  Here, plaintiff offers no evidence that other employees were allowed to avoid interaction with their supervisors.  Furthermore, the court notes that there is no evidence that Schafer, aside from implementing and announcing the reorganization, had anything to do whatsoever with plaintiff's workplace issues.  As such, the court finds plaintiff's request to be unreasonable on its face.

Finally, plaintiff argues that all of her requests could have been taken care of had defendant simply allowed her to work exclusively from home.  Through multiple emails between plaintiff's counsel and Courreges, defendant informed plaintiff that it could not make a decision on this request until it knew: (1) whether plaintiff could perform the essential functions of the job, (2) whether plaintiff would be willing to come onsite and complete a seven-week training

course, and (3) plaintiff's performance and capabilities on the job after her completion of the course.  Defendant based these requirements on the fact that, given her extended leave of absence, plaintiff had never actually worked as an LSO training coordinator.  However, Courreges indicated that defendant was "open to discussing whether and under what circumstances working remotely may be feasible after [plaintiff had] completed the initial training period."  Dkt. 37-1, at 86.  Plaintiff's response to defendant's requirements was that she would be unable to return to active employment, for any reason, including training, unless she was *assured* that she would be allowed to subsequently work from home.  Dkt. 37-1, at 87.

By this point, the sixty-day period in which plaintiff had to establish herself in an open position had expired.  Therefore, in an email dated May 6, 2013, Courreges wrote the following: "under BNSF policy, Ms. McCord's 60-day leave of absence to place herself on a position has expired and she is considered to have resigned her employment as of April 29, 2013."  Dkt. 37-1, at 89.  That same day, plaintiff's counsel responded to Courreges, claiming that at no time did plaintiff voluntarily end her employment with defendant and that it was "clear that the company [had] terminated her employment under pretextual circumstances, given its labeling of her employment cessation a 'resignation.'"  Dkt. 37-1, at 89.

To show that her request was at least *facially reasonable*, plaintiff argues that defendant made the remote-work accommodation available to other similarly situated LSO employees, namely Plute and LSO training coordinator Heather Turner ("Turner").  Plaintiff further alleges that both Plute and Turner "identified their LSO 'training' as having been extremely informal and entirely different in nature to that which was identified to [plaintiff] as necessary for her to receive."  Dkt. 43, at 10.

Plute, a senior training coordinator, testified that she was allowed to work from home during her six-week maternity leave.  Dkt. 37-2, at 11.  She indicated that defendant provided technology equipment, namely a docking station, to assist her in working remotely.  Dkt. 37-2, at 11.  However, Plute testified that defendant asked her to work remotely during her maternity leave only on an "as needed" basis to assist with an audit.  Dkt. 37-2, at 11.  In fact, the very reason plaintiff was retained as a contract employee was so that she could perform Plute's day-to-day activities while Plute was on maternity leave.  Dkt. 37-2, at 4.  While Plute also stated that, at the end of her maternity leave, she has, at times, continued to work from home, she never indicated that she worked *exclusively* from home.  Dkt. 37-2, at 11.  Similarly, Turner testified that everyone on the team has worked from home sporadically, "for instance, when there's bad weather."  Dkt. 37-3, at 3.  Despite this testimony, aside from her own affidavit, plaintiff fails to offer any evidence that defendant allowed any of its employees to work *exclusively* from home. The Tenth Circuit has held that "[w]hen a party relies on affidavit evidence, it may be insufficient to create a triable fact if it is nonspecific or otherwise non-responsive, vague, *conclusory, or self-serving*."  *Piercy v. Maketa*, 480 F.3d 1192, 1197-98 (10th Cir. 2007) (citing *Salguero v. City of Clovis*, 366 F.3d 1167, 1177 n.4 (10th Cir. 2004)) (emphasis added).

Plaintiff also seems to allege that she did not even need to come into the office to train for the position because no other LSO training coordinator had such prior training.  Plute testified that, while she did not receive any specific training prior to transferring to the team, there was ongoing, on-the-job training.  In fact, at the time of her deposition, nearly five months after her transfer to the LSO team, she was still "technically training."  Dkt. 37-2, at 10.  Plute stated that "[t]here [were] similarities in what we did in NARS and what we do with LSO, but you would still need some guidance of some sort to get up to speed."  Dkt. 37-2, at 14.  Similarly, Turner

testified that she did not receive any formal training for the position before she started but has received informal training from her colleagues. Dkt. 37-3, at 2-3. Turner testified that the job of an LSO training coordinator is "not a job that you could learn everything all at once. It's more of over time, you'll understand new things." Dkt. 37-3, at 2.

While it is true that neither Plute nor Turner received "formal" training consisting of a specifically set-aside block of time, both indicated that the training they did receive was an on-the-job sort from their colleagues. It seems possible, then, that plaintiff could have used this same approach with regard to training *except for the fact that*, because of her request to work exclusively from home, she would not have had the same interaction with her colleagues. Because plaintiff has never actually worked as an LSO training coordinator, it is impossible for her to know that she would not, in fact, need the training period absent her ability to receive in-person, on-the-job training.

The court finds that no reasonable jury could find that plaintiff's proposed accommodations were reasonable on their face. As such, defendant's request for summary judgment on plaintiff's disability discrimination claim (Count II) is granted.

**Retaliation**

Finally, plaintiff alleges retaliation with respect to both her gender and disability discrimination claims. More specifically, in her Amended Complaint plaintiff alleges retaliation for: (1) asserting her right to a reasonable accommodation (Count III), and (2) expressing her concern about the actions of Priest (Count IV) which resulted in two materially adverse actions: (1) an unreasonable and unjustifiable reassignment, and (2) termination. In response, defendant alleges that plaintiff fails to demonstrate a materially adverse action or provide a causal connection between the protected activity and the alleged adverse employment action.

Much as was the case with her discrimination claims, plaintiff offers no *direct* evidence of this alleged retaliatory behavior.  In the absence of any direct evidence, courts in this Circuit have used the widely known analytical framework articulated in the Supreme Court case *McDonnell-Douglas Corp. v. Green*.  411 U.S. 792 (1973); *see also Proctor v. UPS*, 502 F.3d 1200, 1207 (10th Cir. 2007) (holding that retaliation claims are analyzed under the *McDonnell-Douglas* burden-shifting framework).  This framework first requires a plaintiff to establish a prima facie case of discrimination.  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).  Once established, the defendant employer must offer a "legitimate nondiscriminatory reason for the adverse employment action."  *Id*.  The burden then shifts back to the plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."  *Id*.

The court notes that, despite plaintiff's initial allegations of retaliation (namely denial of reasonable accommodation, transfer to another position, and termination), it appears from her brief that she is focused solely on what she considers to be the "actual" adverse action: her termination from employment.  Therefore, the court concentrates its discussion of retaliation on plaintiff's termination.

## A.    Prima facie case[4]

To establish a prima facie case for retaliation, a plaintiff must show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between

---

[4] The Court notes that claims of retaliation under both the ADA and Title VII are analyzed using the same basic framework: (1) protected activity; (2) materially adverse action; and (3) causal connection.  While analysis under prongs one and two are identical under both statutory schemes, analysis of the causal connection varies with regard to Title VII claims.

the protected activity and the materially adverse action." *Proctor*, 502 F.3d at 1208 (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).

The anti-retaliation provision of the ADA, much like that of Title VII

protects an individual not from *all* retaliation, but from retaliation that produces an injury or harm . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (quoting *Burlington*, 548 U.S. at 67-68). Although not specifically stated, defendant does not seem to contest the fact that plaintiff engaged in protected activity or that her termination was a materially adverse action. Therefore, only causation is at issue.

### 1.     ADA Retaliation

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Sanders v. Shinseki*, 2012 U.S. Dist. LEXIS 169415, at *20 (D. Kan. Nov. 29, 2012) (citing *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)). "But unless a very close temporal proximity exists between the protected activity and the alleged retaliation, the plaintiff must offer additional evidence to establish causation. *Id.* (citing *Connor v. Schnuck Mkts. Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

Here, plaintiff alleges that the protected activity is both her "status as a person possessed of one or more disabling conditions," and her request for reasonable accommodation. Dkt. 1-1, at 6. Plaintiff's mere allegation that she is a disabled person is not a basis for retaliation. As noted above, to establish a prima facie case of retaliation, plaintiff must show that she "engaged in protected opposition to discrimination." *Proctor*, 502 F.3d at 1208 (citing *Argo*, 452 F.3d at

1202).  Plaintiff's bare assertion that defendant "unlawfully retaliated against [her] as a direct and proximate result of her status as a person possessed of one or more disability conditions," (Dkt. 1-1, at 6) is insufficient to meet this requirement.

Plaintiff next alleges that she was terminated because of her request for reasonable accommodation.  The record shows that plaintiff requested to work exclusively from home on March 12, 2013.  Through a series of emails between plaintiff's counsel and Courreges, it was determined that plaintiff was not even willing to come in for training on her new position, which she had been assigned to but not yet started at the time of her short-term disability leave.  Defendant informed plaintiff that it could not make a decision regarding her accommodation request until she completed the training.   Given plaintiff's unwillingness to complete the training, defendant considered plaintiff to have resigned approximately six weeks later, on April 29, 2013, in accordance with its employment policy.  The Tenth Circuit has held that a period of six weeks between the protected activity and the materially adverse action gives rise to a rebuttable inference of a causal connection.  *See Anderson*, 181 F.3d at 1179.  Therefore, giving plaintiff the benefit of the doubt, she has established a causal connection with regard to her claim of retaliation in response to her request for reasonable accommodation. As such, the analysis on this claim must proceed to the next step under the *McDonnell-Douglas* analysis, which is whether defendant can offer a "legitimate nondiscriminatory reason for the adverse employment action."  *Smothers*, 740 F.3d at 538 (citing *MacKenzie*, 414 F.3d at 1274).  If so, the burden shifts back to plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."  *Id*.

Here, defendant states that plaintiff's alleged involuntary separation was the result of three things: (1) she had been on leave for nearly eight months, (2) her proposed conditions on

which she would return to work were unreasonable, and (3) she refused to return to the workplace to be trained in her new role. Dkt. 47, at 20. Plaintiff has not responded with specific facts which suggest otherwise. As such, no reasonable jury could find that defendant retaliated against plaintiff for her request for reasonable accommodation. Defendant's motion for summary judgment with regard to plaintiff's retaliation claim concerning her request for reasonable accommodation (Count III) is therefore granted.

### 2.      Title VII Retaliation

In 2013, the Supreme Court altered its view of causation with regard to Title VII retaliation claims. These claims are now subject to a heightened "but-for" causation standard. Under this standard, "a plaintiff making a retaliation claim 'must establish that his or her protected activity was a *but-for* cause of the alleged adverse action by the employer.'" *Grote v. Beaver Express Serv., LLC*, 2013 U.S. Dist. LEXIS 115383, at *22-23 (10th Cir. 2013) (citing *Univ. Of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (emphasis added)). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533.

Given this heightened causation standard, plaintiff is required to show that, absent defendant's retaliatory intent due to plaintiff's complaints about Priest, she would not have been terminated. Plaintiff offers absolutely no evidence of such retaliatory intent. Furthermore, the court notes that plaintiff's termination occurred on April 29, 2013, nearly a year after any documented complaints about Priest by plaintiff. No reasonable jury could find that defendant retaliated against plaintiff for her complaints about Priest. As such, defendant is entitled to summary judgment on plaintiff's Title VII retaliation claim (Count IV).

24

**IT IS THEREFORE ORDERED** this 23rd day of September, 2014, that defendant's Motion for Summary Judgment (Dkt. 37) is hereby granted.

s/ J. Thomas Marten _____
J. THOMAS MARTEN,
CHIEF JUDGE